[Cite as *State v. Shumaker*, 2015-Ohio-250.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 14AP-55 |
| v. | : | (C.P.C. No. 10CR06-3591) |
| Ronald A. Shumaker, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 14AP-64 |
| v. | : | (C.P.C. No. 11CR09-5177) |
| Helen I. Shumaker, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on January 27, 2015

*Ron O'Brien*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellee.

*Todd W. Barstow*, for appellant Ronald A. Shumaker.

*Siewert & Gjostein Co., LPA*, and *Thomas A. Gjostein*, for appellant Helen I. Shumaker.

APPEALS from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1}   In these two appeals, defendants-appellants, Ronald A. Shumaker and Helen I. Shumaker, each appeal from judgments of conviction entered by the Franklin County Court of Common Pleas.  Because their convictions are supported by sufficient evidence and are not against the manifest weight of the evidence, we affirm those judgments.

## I.  Factual and Procedural Background

{¶ 2}   In 2005, Trio Custom Homes ("Trio") built a house at 8858 Coldwater Drive in Powell, Ohio.  Trio advertised the house as "custom built, with luxury and quality throughout."  It contained four bedrooms and three and one-half bathrooms.   The house had over 3,000 square feet of livable space and an unfinished 1,500 square foot basement. Trio listed the house for sale at $449,000.

{¶ 3}   Sometime in 2006, Robert Curry, who owned Trio at the time, was approached by Jacob Shumaker, one of appellants' sons, and Bryan Duelley, who both co-owned a mortgage firm, Apex Finance ("Apex").   They told Curry that they had an employee who was interested in buying a house.  They also discussed the financing of the deal.  They were looking for a way to structure the sale so that their buyer would be able to "get cash back."  Simply put, the buyer wanted to buy the house at an inflated amount over the sale price so that the buyer could take the difference back in cash.  (Tr. 202.)

{¶ 4}   It appears that Jacob had talked to his brother, Zachariah Shumaker, another of appellants' children, about an opportunity to buy a house with equity up front. (Tr. 398.)   Zachariah and the appellants went to see the house and talked about the opportunity during the visit.  They discussed buying the house together and splitting the bills up evenly while they all lived there.   They also thought they would receive a significant amount of money up front at the closing, close to $250,000 or $300,000.  (Tr. 403.)  Their plan was to use some of the money to quickly finish the basement and use the remaining money for their own personal purposes.  (Tr. 404-05.)  They thought that after they finished the basement the house would be worth whatever inflated price they paid so that they could sell the house and pay off the loan they took out to buy the house.

{¶ 5}   Ultimately, Zachariah agreed to buy the house for $735,000.  He went to Duelley to get the loan for the home purchase.[1]  It appears that Zachariah and the appellants initially wanted to all be on the loan, but for some reason, Duelley told Zachariah that the loan could only be in his name.  (Tr. 431.)  Duelley, however, told him that he would still use all three of their incomes for them to qualify for the loan. Zachariah and appellants knew that his own income would not qualify for what would be a large loan.  (Tr. 432.)  At the time, Zachariah had been employed by BCD Travel for less than one year as a customer service specialist making around $33,000 a year.  The loan application filled out by Duelley and Zachariah, however, indicated that Zachariah had been at his current employment for more than two years and that his job title was a "Regional Analyst."  It also indicated that his monthly income was $16,500, which would equate to $198,000 of income per year.  When the lender called BCD Travel to verify Zachariah's employment, he persuaded a co-worker to answer the phone and confirm the false employment information contained in the loan application. Additionally, a document purporting to be a personal bank statement was sent to the lender which falsely claimed an inflated amount of cash in Zachariah's bank account.  Based on that false information, the lender approved the loans for Zachariah.  The total monthly payment for the two loans equaled almost $6,000.

{¶ 6}   Shortly before the closing, Zachariah talked to appellants about the reservations he had about the transaction and that he was uncomfortable being the only person liable for the loan.  Appellants were very encouraging and told him that they had talked to the right people and that the loan was legitimate so that they should proceed with the transaction.  (Tr. 433.)  They also told him that they would stick to the plan and that all three would make payments toward the loan's monthly payments.  (Tr. 614.)

{¶ 7}   Zachariah and the appellants did proceed with the transaction.  Pursuant to the plan, Xpert Construction ("Xpert"), another entity owned by Duelley and Jacob Shumaker, received a $260,683.78 check for improvements to the house shortly after the closing.   That check constituted the "cash back" amount over and above what Trio received for the home sale and other miscellaneous items.  The check was deposited into Xpert's account and then Duelley and Jacob wrote a check from Xpert's account to

---

[1] There were actually two loans given to Zachariah, one for $588,000 and a second for $147,000.

Zachariah for the same amount. Within days of the receipt of that check, Zachariah deposited the check and wrote a check to the appellants for $174,855.63, or two-thirds of the initial check. Appellants deposited that check and then began paying off a number of outstanding debts. Ronald did use some of the money to begin to finish the house's basement.

{¶ 8} In addition to that check, the parent company of Apex received a check for $26,998 shortly after closing for its mortgage broker fees. After the parent company took its own fee, it delivered Apex a check for $26,098. Within days, Apex wrote a check for $14,000 to Helen, a secretary at Apex, purportedly for commission on the sale of the house Zachariah purchased. Jacob and Duelley also received checks for $5,000 and $6,000 respectively.

{¶ 9} Eventually, Zachariah and appellants moved into the house and Ronald began work on the basement. Within one year of the purchase, however, they all lost their jobs. As a result, they were unable to make the monthly loan payments and their house was foreclosed on by the lender. Additionally, detectives from the Columbus Police Department's Economic Crime Unit, during an investigation of a nearby house, noticed that Zachariah bought the house for a significantly higher price than its market value. The detectives investigated and discovered the above details.[2]

{¶ 10} As a result, a Franklin County Grand Jury indicted both appellants for one count of receiving stolen property in violation of R.C. 2913.51 and one count of money laundering in violation of R.C. 1315.55.[3] Both appellants entered not guilty pleas and proceeded to a jury trial.

{¶ 11} The witnesses at trial largely testified to the above version of events. Ronald, however, testified that he and his wife never knew of the fraudulent manner by which Zachariah obtained the loan to purchase the house.

{¶ 12} The jury found both appellants guilty of both counts and the trial court sentenced them accordingly.

---

[2] In addition to the appellants, criminal charges arising from this transaction were filed against Duelley and both Jacob and Zachariah Shumaker. Those three all entered guilty pleas to various charges.

[3] Helen was also charged with two other counts that were dismissed before trial, so that both appellants only faced these counts at trial.

**II.  The Appeal**

{¶ 13} Both appellants appeal their convictions and assign similar assignments of error.  First, Ronald asserts :

> The trial court erred and deprived appellant of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and Article One Section Ten of the Ohio Constitution by finding him guilty of money laundering and receiving stolen property as those verdicts were not supported by sufficient evidence and were also against the manifest weight of the evidence.

{¶ 14} Second, Helen asserts:

> Appellant's conviction was not supported by the sufficiency of the evidence in violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and Article I, Sections 1 & 16 of the Ohio Constitution and the conviction was also against the manifest weight of the evidence.

{¶ 15} Because these assignments of error each address the same issues, we will address them together.

**A.  The Sufficiency and Manifest Weight of the Evidence**

{¶ 16} In their assignments of error, appellants contend that their convictions are not supported by sufficient evidence and are also against the manifest weight of the evidence.  Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally adequate to support a verdict.  *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  Whether the evidence is legally sufficient to support a verdict is a question of law.  *Id.*

{¶ 17} In determining whether the evidence is legally sufficient to support a conviction, " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' "  *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.  A verdict will not be disturbed unless, after viewing the evidence in the light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact.  *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

{¶ 18} In this inquiry, appellate courts do not assess whether the state's evidence is to be believed, but whether, if believed, the evidence admitted at trial supports the conviction. *State v. Yarbourgh*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79-80 (evaluation of witness credibility not proper on review for sufficiency of evidence); *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime.").

{¶ 19} On the other hand, the manifest weight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other. *Thompkins* at 387. Although there may be sufficient evidence to support a judgment, a court may nevertheless conclude that a judgment is against the manifest weight of the evidence. *Id.*

{¶ 20} When presented with a challenge to the manifest weight of the evidence, an appellate court may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.* at 387. An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983); *State v. Strider-Williams*, 10th Dist. No. 10AP-334, 2010-Ohio-6179, ¶ 12.

{¶ 21} In addressing a manifest weight of the evidence argument, we are able to consider the credibility of the witnesses. *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6. However, in conducting our review, we are guided by the presumption that the jury, or the trial court in a bench trial, " 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Accordingly, we afford great deference to the jury's determination of witness credibility. *State v. Redman*, 10th Dist. No. 10AP-

654, 2011-Ohio-1894, ¶ 26, citing *State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 55. *See also State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus (credibility determinations are primarily for the trier of fact).

## B. The Convictions

{¶ 22} In order to find appellants guilty of receiving stolen property, the state had to prove that they received, retained, or disposed of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense. R.C. 2913.51(A).

{¶ 23} In order to find appellants guilty of money laundering, the state had to prove that they conducted, structured, or attempted to conduct or structure a transaction that involved the proceeds of corrupt activity that is of a value greater than $10,000 if the person knew or had reasonable cause to know that the transaction involved the proceeds of corrupt activity. R.C. 1315.55(A)(4).

{¶ 24} Although the statutory language for each offense is slightly different, in essence, the state had to prove for each that the appellants knew or had reasonable cause to know of the fraudulent manner by which Zachariah obtained the loan.[4]

## C. Appellants' Argument–Did they know?

{¶ 25} Appellants argue that the state presented no evidence that they knew about the fraudulent conduct that Duelley and Zachariah engaged in to obtain the loan. We disagree.

{¶ 26} A person has knowledge of circumstances when he is aware that such circumstances probably exist. R.C. 2901.22(B). "When determining whether a defendant acted knowingly, his state of mind must be determined from the totality of the circumstances surrounding the alleged crime." *State v. Edwards*, 10th Dist. No. 12AP-993, 2013-Ohio-3597, ¶ 10. "[W]hether a person acts knowingly can only be determined, absent a defendant's admission, from all the surrounding facts and circumstances, including the doing of the act itself." (Footnotes omitted). *State v. Huff*, 145 Ohio App.3d 555, 563 (1st Dist.2001).

---

[4] No one disputes that such conduct constituted a theft offense or a corrupt activity for purposes of the convictions.

{¶ 27} Duelley and Zachariah testified that they engaged in multiple acts of fraud in order for Zachariah to get the $735,000 loan he would not have otherwise qualified for. These acts included providing false information regarding his employment history, assets, and income in Zachariah's loan application. Ronald denied knowing anything about how his son obtained such a large loan. Zachariah testified that he discussed the plan to purchase the house with his parents but did not testify that he told them of the manner in which he obtained the large loan to purchase the house. Duelley also testified that he never discussed the fraud with appellants.

{¶ 28} Ronald denied knowing about his son's conduct. The state may, however, rely on circumstantial evidence to prove this element of the offense. Culpable mental states are frequently demonstrated through circumstantial evidence. *State v. Ramey*, 10th Dist. No. 11AP-485, 2012-Ohio-1015, ¶ 26; *State v. Collins*, 89 Ohio St.3d 524, 530 (2000); *State v. Ingram*, 10th Dist. No. 11AP-1124, 2012-Ohio-4075, ¶ 22. Circumstantial evidence is " 'the proof of certain facts and circumstances in a given case, from which the jury may infer other connected facts which usually and reasonably follow according to the common experience of mankind.' " *State v. Brown*, 10th Dist. No. 07AP-244, 2007-Ohio-6542, ¶ 19, quoting *State v. Golden*, 8th Dist. No. 88651, 2007-Ohio-3536, ¶ 16; *State v. Banks*, 182 Ohio App.3d 276, 2009-Ohio-1892, ¶ 11 (10th Dist.).

{¶ 29} Here, after viewing the evidence in the light most favorable to the prosecution, there is sufficient circumstantial evidence that would allow reasonable minds to conclude that appellants knew or had reasonable cause to know that their son engaged in some sort of fraud to obtain the loan. Appellants and Zachariah testified that they all agreed to the plan to buy this house and to get a large amount of cash from the transaction. Zachariah further testified that they were a close family that would get together at times and would sometimes talk about this plan during some of those times. (Tr. 426.) Zachariah testified that appellants knew his employment history and generally knew his income. (Tr. 427.) They also knew that his own income would not be enough to cover the cost of the loan. (Tr. 432.) Further, appellants previously purchased two other houses. In each, they took out loans to pay for the house. They also took out a home equity line of credit on one of those houses to pay for improvements to the house. For each of those transactions, they filled out an application to qualify for the loan. Thus, they

had general knowledge of how the loan process works. This background knowledge of the loan process, coupled with appellants' knowledge of Zachariah's employment history and income and that the plan they all agreed to required a large loan, allows reasonable minds to conclude that appellants knew or, at the least, reasonably should have known that Zachariah engaged in some sort of fraud in order to qualify and receive such a large loan. As aptly stated by the prosecutor, does "borrowing $735,000 on a $33,000-a-year income sounds way too good to be true?" (Tr. 744.)

{¶ 30} Similarly, we do not find that this is the exceptional case where the jury lost its way so as to create a manifest miscarriage of justice. Although Ronald denied that appellants knew of the conduct that their son and Duelley engaged in to qualify for the loan, based on the totality of the circumstances, we cannot conclude that the jury clearly lost its way when it rejected that denial and concluded that appellants knew or reasonably should have known of that conduct. *State v. White*, 10th Dist. No. 09AP-1168, 2010-Ohio-3033, ¶ 16. This is not the exceptional case in which the evidence weighs heavily against the convictions.

{¶ 31} For these reasons, we conclude that appellants' convictions are supported by sufficient evidence and are not against the manifest weight of the evidence. Accordingly, we overrule appellants' assignments of error.

## III. Conclusion

{¶ 32} Having overruled appellants' assignments of error, we affirm the judgments of the Franklin County Court of Common Pleas in both of these cases.

*Judgments affirmed.*

TYACK and BROWN, JJ., concur.

————————————