[Cite as *State v. Hollingsworth*, 2026-Ohio-659.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 24AP-336 |
| | | (C.P.C. No. 22CR-5216) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Ceedric R. Hollingsworth, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on February 26, 2026

**On brief:** *Shayla D. Favor*, Prosecuting Attorney, and *Mark R. Wilson*, for appellee. **Argued:** *Mark R. Wilson*.

**On brief:** *Carpenter Lipps LLP*, *Kort Gatterdam*, and *Michael B. Rogers*, for appellant. **Argued:** *Michael B. Rogers*.

APPEAL from the Franklin County Court of Common Pleas

JAMISON, J.

{¶ 1}  Defendant-appellant, Ceedric R. Hollingsworth, appeals from convictions by bench trial in the Franklin County Court of Common Pleas.  For the following reasons, we affirm the judgment of the trial court.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2}  On November 7, 2022, appellant was indicted by a Franklin County Grand Jury on the following charges: Count 1, felonious assault, a violation of R.C. 2903.11, a felony of the second degree; and Count 2, having weapons while under disability ("HWUD"), a violation of R.C. 2923.13, a felony of the third degree.  The felonious assault charge carried with it a 3-year firearm specification.  The HWUD charge was based on an April 2019 conviction for aggravated assault.

{¶ 3}    Appellant entered not guilty pleas to the charges contained in the indictment.

{¶ 4}    On May 5, 2024, the day before trial, appellant filed a motion in limine, seeking to exclude certain 9-1-1 calls under the Confrontation Clause of the Sixth Amendment to the United States Constitution.

{¶ 5}    The next morning, the trial court stated that it "dealt with" appellant's motion in limine in chambers. (May 6, 7, 8, & 9, 2024 Tr. at 5.) After listening to the 9-1-1 call in chambers with counsel present, the trial court overruled appellant's motion.

{¶ 6}    Appellant voluntarily waived his right to a trial by jury and elected to be tried by a judge of the court.

{¶ 7}    Before presenting its first witness, plaintiff-appellee, State of Ohio, played the 9-1-1 call in open court. The caller was the alleged victim, S.B. At the beginning of the call, it does not appear that S.B. realized he was connected to 9-1-1. (State's Ex. A-1.) He is heard repeatedly yelling, "You better kill me." (State's Ex. A-1 at 0:01.) When he began speaking with the dispatcher, he reported that his brother, appellant, shot at him. S.B. also referred to appellant as "Sunny." (State's Ex. A-1 at 0:11.) S.B. provided a description of appellant and his clothing, indicated that appellant had fled the scene, and provided a possible location for appellant.

{¶ 8}    The state introduced certified copies of appellant's conviction for aggravated assault in Franklin County Court of Common Pleas case No. 18CR-2838.

{¶ 9}    Brian White testified that on the evening of January 12, 2022, he was at his apartment on North Champion Avenue in Columbus. He heard approximately five gunshots outside. He retrieved his firearm and called 9-1-1 before stepping outside. White observed two males running in opposite directions. One got into a red sedan, possibly a Ford Focus, and fled the scene.

{¶ 10}   Columbus Police Department ("CPD") officer Samuel Conley testified that on the evening of January 12, 2022, he was dispatched to Hawthorne Avenue in Columbus, Franklin County, Ohio on the report of an offense involving a firearm. Shortly thereafter, he began receiving ShotSpotter alerts to that area. ShotSpotter is a system of antennae/sensors that alert authorities to gunfire in certain areas. Upon their arrival, CPD officers located five shell casings on Hawthorne Avenue, just east of North Champion

Avenue. The shell casings were from a .45 caliber firearm. Officers then blocked traffic to Hawthorne Avenue and secured the scene.

{¶ 11} Emily Moore testified that appellant is the father of her two children. She indicated that appellant also went by the nicknames "Suno" or "CeeSunny." Moore was in a romantic relationship with appellant for approximately 5 years, beginning when she was 17. Moore characterized their relationship as "terrifying." (Tr. at 62.) Moore testified, over appellant's objection, that she ended their relationship because appellant hurt her child.

{¶ 12} Moore and appellant were still in a relationship on the evening of the incident in question. That day, the two were delivering food through DoorDash to make some extra money. Appellant was driving and they had their daughter with them in the car, a 2007, light blue Volkswagen Eos. Moore testified that appellant was skittish about driving her car because he was "on the run." *Id.* at 67. At one point, appellant became angry because they were running low on gas, and they had no money. He indicated that his brother, S.B., owed him $10. Appellant thought they could use that money for gas, but S.B. told him they could not come and get the money. Appellant began speeding and saying "foul things" about S.B. *Id.* at 70.

{¶ 13} When they arrived at S.B.'s apartment building, S.B. and his girlfriend, Annetta Cooper, were outside in separate vehicles. S.B. was in a red Nissan Altima or Kia. Cooper was in a red Nissan Rogue. Cooper's vehicle was in front of the vehicle Moore and appellant were occupying. S.B.'s vehicle was further up the street on the opposite side. Moore testified that S.B. left the money in a soap dish on his front porch. Appellant refused to go get the money because he was "on the run" and did not want to be seen on any security cameras. *Id.* at 73.

{¶ 14} Appellant angrily jumped out of the car and slammed the door. He and S.B. began yelling back and forth for a couple of minutes. Appellant then opened the car door, reached under the driver's seat, and pulled out a gun. As he did so, he said something like "[t]his will make him pay" or "[t]his will get my money back." *Id.* at 78. Appellant slammed the car door again. Moore testified that the gun was a Remington, and it belonged to appellant. According to Moore, appellant always had the gun "on him." *Id.* at 79. She recalled when he purchased the gun because he was very excited to show it to her.

{¶ 15} Once he obtained his gun and got out of the car, appellant held the gun up directly in front of himself. He was "[p]ointing it straight towards [S.B.]" *Id*. at 80. Moore heard five or six gunshots. She put her head down after the first one. She looked back after the third shot and yelled for appellant to get back in the car. She observed appellant fire multiple shots at S.B. *Id*. at 138. Cooper got out of her car and began yelling for S.B. S.B. got into his vehicle and drove into the middle of the intersection. S.B. was yelling something as Moore and appellant drove off. Moore and appellant drove off in the opposite direction of S.B. Appellant told Moore that he did not have time to pick up the shell casings.

{¶ 16} When they left the scene, appellant called his other brother to come pick him up. Appellant drove to a tobacco and alcohol drive-thru. His brother was inside. Appellant told Moore to turn off her location on her phone, go back home, and tell police she had not seen him in months. Appellant got into his brother's car and Moore got into the driver's seat of their vehicle. Moore did what appellant told her to do. Within a minute of Moore arriving home, the police were shining lights into her window. She opened the back door, and officers told her they were looking for someone. They had everybody exit the home. Moore lied to the officers. She told them that she did not know when she saw appellant last. She told officers she believed he was living off of East Broad Street or East Main Street.

{¶ 17} After the police left, appellant and his brother entered the home within minutes. Appellant told Moore to move in with her father in Mansfield. Moore, who was pregnant at the time, moved her and her daughter into her father's house that same week. After she moved in with her father, at appellant's direction, she sent him daily videos of her in her father's home. This was to ensure that there was no one appellant did not approve of in the house. If she did not send him the videos, he would threaten and harass her.

{¶ 18} Approximately one week after she moved to her father's house, appellant called Moore and asked her to retrieve the gun's box out of storage so he could sell it. She went to the storage unit but was unable to find the box. Moore eventually found the box after she and appellant moved to a new residence. This was two years after appellant first told her to retrieve the box from storage. Moore turned it over to police. She also turned over a box of .45 caliber ammunition that she found.

{¶ 19} On cross-examination, Moore testified that she came forward with the above information after a conversation with the judge hearing a different case involving her and

appellant. This was approximately two years after the incident in this matter. In response to follow-up questions from appellant's trial counsel, Moore eventually testified that she believed appellant was on the run for cutting off his probation-issued ankle monitor. Moore testified that she came forward later because she knew appellant could not get out of jail and she was no longer afraid.

{¶ 20} On redirect, Moore testified that she eventually came forward because appellant was incarcerated, she went through therapy, and she felt safer. On recross, Moore admitted that for two years she claimed that the allegations against appellant in this case were not true.

{¶ 21} CPD Detective Peter Derdzinski testified he responded to the scene on the evening of January 12, 2022. When he arrived, he spoke with S.B. and Cooper. He spoke to them on Granville Street, which is a couple blocks away from Hawthorne Avenue. After speaking with them, he went to the scene and took photographs. He then had patrol officers transport the shell casings to the property room as evidence. The shell casings were in the middle of the road. Approximately two years later, Derdzinski collected the Remington gun box and a tub of ammunition from Moore. The ammunition was the same brand, caliber, and color as the shell casings collected from the scene.

{¶ 22} CPD Officer Rodney Mayberry testified that he was a member of the CPD Special Weapons and Tactics ("SWAT") team. On October 28, 2022, the SWAT team received information that appellant was at an apartment on La Vista Drive in Columbus. The SWAT team entered the apartment and appellant jumped through the closed, glass second-floor window. He was apprehended after he landed.

{¶ 23} After officer Mayberry's testimony, both sides rested. In closing arguments, appellant conceded that the state proved its case regarding the HWUD charge. Instead, appellant argued that the state failed to prove that his actions were an attempt to cause S.B. physical harm. In closing, appellant's trial counsel stated, "if found that [appellant] fired any shots, there's no proof beyond a reasonable doubt that he did it with the intent to harm [S.B.]" *Id.* at 225.

{¶ 24} The trial court found appellant guilty as charged in the indictment. In rendering its verdict, the trial court found the testimony of Moore to be the "most complete and credible" evidence. *Id.* at 231. Notably, the trial court found Moore's reasons for her

late disclosure of information credible.  As for the 9-1-1 call, the trial court stated that the "initial part of the 911 recording is clearly proper as evidence, despite the lack of confrontation with [S.B.] because he didn't testify during trial." *Id*. at 236.  The trial court went on to explain that after S.B.'s initial excited utterances, "the 911 call goes on for several minutes and in the [c]ourt's view was not helpful to a determination of this case. Accordingly, most of the 911 recording has been disregarded in the [c]ourt's analysis of the evidence." *Id*.

{¶ 25} The trial court sentenced appellant to a total indefinite prison term of six to seven and a half years.  That sentence was ordered to run consecutively to appellant's prison term in Franklin County Court of Common Pleas case No. 22CR-5217.

{¶ 26} Appellant now brings this appeal.

## II.  ASSIGNMENTS OF ERROR

{¶ 27} Appellant assigns the following as trial court errors:

> [1.]  THE ADMISSION OF ALL OR PART OF THE 911 CALL VIOLATED APPELLANT'S RIGHTS TO CONFRONT WITNESSES AGAINST HIM AND MEET THEM FACE TO FACE AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE 1 SECTION 10 OF THE OHIO CONSTITUTION.
>
> [2.]  THE ADMISSION OF OTHER-ACTS TESTIMONY AND EVIDENCE INVOLVING AN EX-GIRLFRIEND VIOLATED APPELLANT'S RIGHTS TO DUE PROCESS AND TO A FAIR TRIAL AS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS.
>
> [3.] THE TRIAL COURT COMMITTED STRUCTURAL ERROR BY EXHIBITING BIAS, PREJUDICE, AND/OR PRODDING OF WITNESSES TO ELICIT PARTISAN TESTIMONY, VIOLATING DEFENDANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL.
>
> [4.] APPELLANT WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND SECTION 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION WHEN COUNSEL INQUIRED INTO THE INTRODUCTION OF OTHER ACTS EVIDENCE.

(Sic passim.)

### III. STANDARD OF REVIEW

{¶ 28} The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" Under the Confrontation Clause, testimonial statements of a witness are inadmissible when the witness does not appear at trial, unless the witness was unavailable to testify and the defendant had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). This right applies to both federal and state prosecutions. *State v. Durdin*, 2014-Ohio-5759, ¶ 15 (10th Dist.). "We review the question of whether the trial court violated an individual's Confrontation Clause rights under a de novo standard." *Id*. Violations of a defendant's Confrontation Clause rights are not considered structural error and are subject to harmless-error analysis. *State v. Phillips*, 2019-Ohio-2930, ¶ 13 (10th Dist.).

{¶ 29} Generally, "the admission of evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice." *State v. Conway*, 2006-Ohio-2815, ¶ 62. However, we analyze challenges to the admission of evidence pursuant to Evid.R. 404(B) under a mixed standard of review. *State v. Stanford*, 2024-Ohio-1451, ¶ 14 (10th Dist.). The admissibility of other-acts evidence is a question of law that must be reviewed using a de novo standard. *State v. Hartman*, 2020-Ohio-4440, ¶ 22. Under the de novo standard of review, an appellate court affords no deference to the trial court's decision and conducts an independent review of the record. *State v. Bridges*, 2015-Ohio-4480, ¶ 7 (10th Dist.).

{¶ 30} "Next, if the other-acts evidence was offered for a permissible purpose, the determination of whether to then admit the evidence—after weighing its probative value against its prejudicial effect—is reviewed for an abuse of discretion." *Stanford* at ¶ 14. An abuse of discretion exists when the trial court has an unreasonable, arbitrary, or unconscionable attitude in reaching its decision. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). In appeals from bench trials in criminal cases, a reviewing court presumes that the trial court "considered only the relevant, material, and competent evidence in arriving at its judgment unless the record affirmatively demonstrates otherwise." *State v. Campbell*, 2009-Ohio-3615, ¶ 25 (10th Dist.).

{¶ 31} Structural errors "are constitutional defects that defy analysis by harmless-error standards because they 'affect[] the framework within which the trial proceeds, rather than simply an error in the trial process itself.' " *State v. Bond*, 2022-Ohio-4150, ¶ 26, quoting *Arizona v. Fulminante*, 499 U.S. 279, 309-310 (1991). Such errors permeate "[t]he entire conduct of the trial from beginning to end," such that the trial cannot " 'reliably serve its function as a vehicle for determination of guilt or innocence . . .' " *Fulminante* at 309-310, quoting *Rose v. Clark*, 478 U.S. 570, 577-578 (1986). Where a defendant objected to a structural error at trial and establishes that error on appeal, the defendant is entitled to reversal regardless of the effect the error had on the outcome. *Bond* at ¶ 42.

{¶ 32} However, "[a] party asserting a structural error is not entitled to automatic reversal if the party did not object to that error in the trial court. Rather, . . . the appellate court must undertake a plain-error analysis." *State v. Phillips*, 2025-Ohio-4555, ¶ 29 (10th Dist.). Crim.R. 52(B) states that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Plain error is one that " 'rises to the level of challenging the legitimacy of the underlying judicial process itself.' " *State v. Santiago*, 2003-Ohio-2877, ¶ 11 (10th Dist.), quoting *Goldfuss v. Davidson*, 1997-Ohio-401, ¶ 28. "[T]he plain error rule should not be invoked unless, but for the error, the outcome of the trial would clearly have been otherwise." *Id.*

{¶ 33} Evid.R. 614(B) permits the trial court to interrogate witnesses, in an impartial manner, whether called by itself or by a party. "The presence of a biased judge on the bench is, of course, a paradigmatic example of structural constitutional error, which if shown requires reversal without resort to harmless-error analysis." *State v. Sanders*, 92 Ohio St. 3d 245, 278 (2001). "Absent a showing of bias, prejudice, or prodding of the witness to elicit partisan testimony, it is presumed that the trial court interrogated the witness in an impartial manner in an attempt to ascertain a material fact or develop the truth." *State v. Blankenship*, 102 Ohio App.3d 534, 548 (12th Dist. 1995). "A trial court's interrogation of a witness is not deemed partial for purposes of Evid.R. 614(B) merely because the evidence elicited during the questioning is potentially damaging to the defendant." *Id.* It is the burden of the defendant to establish that the trial court was biased or impartial in its interrogation of witnesses. *See State v. Granderson*, 2008-Ohio-3757, ¶ 67 (5th Dist.); *see also State v. Phillips*, 2014-Ohio-5162, ¶ 149 (10th Dist.) (burden of proof is on the

defendant to demonstrate prejudice resulting from alleged biased comments by the trial court).

{¶ 34} In considering a claim of ineffective assistance of counsel, this court applies a two-part standard. *State v. Rhoades*, 2020-Ohio-2688, ¶ 42 (10th Dist.), citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989). First, a defendant must demonstrate that counsel's performance was deficient. *Id.* "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland* at 687. To satisfy this prong, the defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Id.* at 688. A defendant's claim of deficient performance must overcome the strong presumption that a licensed attorney's performance fell within the wide range of reasonable professional assistance. *State v. Diallo*, 2025-Ohio-920, ¶ 28 (10th Dist.). "Debatable trial tactics generally do not constitute ineffective assistance of counsel." *State v. Elmore*, 2006-Ohio-6207, ¶ 116. In the second prong, a defendant must demonstrate that counsel's deficient performance was prejudicial. *State v. Pardon*, 2022-Ohio-663, ¶ 36 (10th Dist.). Prejudice is established by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

## IV.  LEGAL ANALYSIS

{¶ 35} In his first assignment of error, appellant argues that the admission of S.B.'s 9-1-1 call violated his Confrontation Clause rights under the United States and Ohio Constitutions. More specifically, appellant contends that statements made during the 9-1-1 call were not testimonial because they were not necessary to address an ongoing emergency. Appellant alleges that there was no ongoing emergency because he and S.B. were no longer at the scene. At the outset, it appears that appellant, although not conceding the issue, is not challenging the 9-1-1 call's admissibility as an excited utterance. Even if he did, a review of state's Exhibit A-1 reveals that, at the very least, the first, and most relevant, part of the call was clearly an excited utterance. Furthermore, a declarant's unavailability need not be shown if the court admits a statement as an excited utterance. Evid.R. 803(2);

*see also Columbus v. C.G.*, 2021-Ohio-71, ¶ 29 (10th Dist.). It should also be noted that our review of this issue is slightly more difficult because most of the discussion on the call's admissibility was held off the record, in chambers.

{¶ 36} The Confrontation Clause's prohibition of otherwise admissible hearsay statements in criminal cases applies only to testimonial statements, such as "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68. To determine whether a statement is testimonial or not, courts apply the primary-purpose test:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis v. Washington*, 547 U.S. 813, 822 (2006). In determining what the primary purpose of the hearsay statement was, a court is required to "objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties." *Michigan v. Bryant*, 562 U.S. 344, 359 (2011). Stated another way, "the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Id*. at 360.

{¶ 37} We were recently confronted with a similar issue in *State v. Elkhabiry*, 2025-Ohio-1028 (10th Dist.). In *Elkhabiry*, the defendant argued that the admission of two eyewitness' answers to responding officers' questions violated his Confrontation Clause rights because there was no ongoing emergency. *Id*. at ¶ 34. More specifically, the defendant argued that the statements were made in a calm tone, and more than ten minutes had passed since the shooting. *Id*. In rejecting the defendant's arguments, we noted that the responding officers' "questioning may have led to the creation of inculpatory evidence, but that was not its primary purpose where an active shooter was at large and police officers

sought to apprehend him." *Id*. Ultimately, we held that the trial court did not err by ruling that these statements were nontestimonial. *Id*.

{¶ 38} The case at hand is similar to that in *Elkhabiry*. Although in *Elkhabiry* our review was limited to plain error, both that case and the one here involved an at-large, active shooter that responding officers were attempting to apprehend. Whether under a de novo standard or plain error, we fail to see how statements made during a 9-1-1 call a short period of time after a shooting, when the suspect has not been apprehended, are rendered testimonial simply because the involved parties are no longer at the scene. *See State v. Wilcox*, 2024-Ohio-5719, ¶ 13 (finding statements made to responding officers prior to suspect's apprehension were nontestimonial). Indeed, in this case, there was no way of knowing that appellant had completely removed himself from the area and was no longer a threat to the victim or the public, in general. We find that at the time of S.B.'s 9-1-1 call, there was still an ongoing emergency despite the parties no longer being at the scene. Furthermore, the questions asked by the dispatcher were narrowly tailored to assist officers in addressing that ongoing emergency. Those questions included ones about the appellant's identity and physical description, as well as the description of the car he was driving. In sum, we find that the specific circumstances surrounding the 9-1-1 call demonstrate that the primary purpose of these statements was to enable officers to address an ongoing emergency.

{¶ 39} In fact, the circumstances supporting a finding that the statements made during S.B.'s 9-1-1 call were nontestimonial are far stronger than those in *Elkhabiry*. Here, the statements were made to a 9-1-1 dispatcher, whereas the statements in *Elkhabiry* were made to officers after they responded to the scene. *Elkhabiry* at ¶ 34. As for appellant's argument that there was no ongoing emergency because the parties were no longer at the scene, that is belied by the record. At the beginning of the 9-1-1 recording, S.B. can be heard repeatedly yelling, "you better kill me." (State's Ex. A-1 at 0:01.) S.B. does not appear to realize he was connected to 9-1-1. The only logical conclusion is that S.B. is yelling this at appellant, which means both parties were still at the scene at the beginning of the 9-1-1 call. This is corroborated by Moore's testimony that she heard S.B. yelling as she and appellant began to drive away. As such, appellant's argument is not well-taken, and we hold that S.B.'s statements during the 9-1-1 call were nontestimonial in nature.

{¶ 40} Even if it could be said that the trial court erred in admitting the 9-1-1 call, that error was harmless beyond a reasonable doubt. Crim.R. 52(A) states that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." After a review of the record, we find that, even without the 9-1-1 call, Moore's uncontroverted testimony overwhelmingly supported appellant's convictions. Her testimony was detailed, specific, and frequently corroborated by other testimony and evidence. Indeed, in announcing its verdict, the trial court stated, "[i]n considering all the evidence, the [c]ourt finds the testimony to be most complete and credible from Emily Moore. This is in a real sense almost a one-witness rule case." (Tr. at 230-231.) We also find that Moore's reasons for her delayed disclosure of information were credible and understandable. As such, the record demonstrates that, even if we found the 9-1-1 call inadmissible, there is no reasonable probability that it contributed to appellant's convictions. *State v. Jones*, 2008-Ohio-3565, ¶ 13 (10th Dist.).

{¶ 41} Based on the foregoing, we overrule appellant's first assignment of error.

{¶ 42} In his second assignment of error, appellant alleges that the trial court erred in admitting prior bad-acts testimony and evidence. Evid.R. 404(B)(1) states that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Nevertheless, such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid.R. 404(B)(2).

{¶ 43} Courts are to apply a three-step analysis in determining whether other-acts evidence is admissible under Evid.R. 404(B). *State v. Williams*, 2012-Ohio-5695, ¶ 19. First, the court must "consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Id.* at ¶ 20. Second, the court must "consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose[.]" *Id.* Last, the court must "consider whether the probative value of the other acts evidence is substantially outweighed by the danger of

unfair prejudice." *Id.* Erroneously admitted other-acts evidence is subject to harmless-error analysis. *State v. Hasbrouck*, 2025-Ohio-5816, ¶ 20 (10th Dist.).

{¶ 44} Appellant points to several pieces of testimony that he contends were improperly admitted as other-acts evidence. Those include Moore's testimony that appellant played mind games, that their relationship was terrifying, that she broke up with appellant because he hurt her child, that appellant was on the run and wanted to avoid law enforcement, and that appellant had a huge sense of entitlement. Appellant also points to testimony from Mayberry that appellant was in a prior barricade situation and was wanted for "shootings." (Tr. at 198.)

{¶ 45} Our review of the record reveals that the vast majority of these statements were relevant. Moore's testimony regarding the nature of her and appellant's relationship was relevant to explaining why it took Moore two years before she came forward with information. Indeed, one of the main avenues appellant took to attack Moore's credibility was her delayed disclosure. Moreover, evidence of flight, "and its analogous conduct, have always been indicative of a consciousness of guilt." *Stave v. White*, 2015-Ohio-5365, ¶ 19 (10th Dist.). Thus, any testimony regarding appellant fleeing, being on the run, or avoiding law enforcement was relevant. As such, most of the testimony appellant alleges was inadmissible was relevant. Furthermore, this evidence was admitted, not to prove appellant's character and conformity therewith, but to explain away a witness's delayed reporting and establish appellant's consciousness of guilt.

{¶ 46} Finally, our review of the record reveals that the probative value of the admitted other-acts evidence was not substantially outweighed by its unfair prejudice. The testimony regarding the other-acts evidence was vague and lacked specific details. For example, Moore's testimony that appellant hurt her child was benign considering what we learned during sentencing about what actually happened. Testimony regarding appellant being on the run and avoiding law enforcement was arguably helpful to appellant's case. With that testimony, appellant could argue that he was avoiding law enforcement due to prior legal issues, not the incident in this matter. Outside of the vague reference to other shootings, none of the other-acts evidence were of a similar nature to the allegations in this case. Thus, the risk of the evidence influencing the trier of fact to conclude appellant was

guilty because of that evidence was minimal. In sum, this lack of prejudice cannot be said to substantially outweigh this evidence's probative value.

{¶ 47} Even if we were to determine that the aforementioned other-acts evidence was inadmissible, the admission of that evidence was harmless error. As previously stated, the evidence was vague and lacking in specific details. Also, the trial court was necessarily going to receive evidence of appellant's violent history. As part of the HWUD charge, the state was required to prove that appellant was previously convicted of aggravated assault. It is doubtful that these nondescript references to other legal issues and other acts would all of a sudden tip the scale in the trier of fact's mind. Moreover, in appeals from bench trials, we presume that the judge only considered relevant, material, and competent evidence unless demonstrated otherwise. *Campbell*, 2009-Ohio-3615, at ¶ 25 (10th Dist.). Here, the trial court's reasoning behind its verdict focused on Moore's testimony and the initial part of the 9-1-1 call. In fact, some of the other-acts evidence seems to have resonated with the trial court in appellant's favor. The trial court stated that appellant's other legal issues demonstrated that the incident surrounding his arrest did not provide persuasive evidence of consciousness of guilt. As such, there was no reasonable probability that this evidence, even if inadmissible, contributed to appellant's convictions.

{¶ 48} Based on the foregoing, appellant's second assignment of error is overruled.

{¶ 49} In his third assignment of error, appellant alleges that the trial court committed structural error by interrogating witnesses in a biased, partisan manner. At the outset, appellant did not object at trial to the manner by which the trial court was interrogating witnesses. Thus, he has waived all but plain error. *Phillips*, 2025-Ohio-4555, at ¶ 29 (10th Dist.). Evid.R. 614(B) permits the trial court to interrogate witnesses in an impartial manner. Based on a review of the record, appellant did not prove that the trial court interrogated the witnesses in a biased or impartial manner. Rather, the trial court's questions merely served to clarify testimony and frequently elicited duplicative testimony. In fact, there are examples where the trial court's questioning went in appellant's favor. For example, the following exchange took place between the trial court and Mayberry regarding the prior barricade situation:

> THE COURT: So you never saw [appellant] inside the house or
> fleeing or anything around --

> THE WITNESS: He must have got word that we were coming and he was gone.
>
> THE COURT: Or you just got bad information?
>
> THE WITNESS: Or we got bad info.

(Tr. at 199.) The trial court's interrogation in this regard is clearly challenging Mayberry's conclusion that appellant fled the scene to avoid apprehension. The questioning elicited testimony that demonstrated that law enforcement's failure to apprehend appellant was potentially based on no actions of appellant.

{¶ 50} Even if we were to analyze appellant's argument as a structural error, a review of the record reveals that the trial court's questioning of witnesses did not permeate the proceedings resulting in a trial that could not reliably serve as a determination of appellant's guilt or innocence. The trial court's interrogation of witnesses was not extensive, elicited duplicative testimony, simply sought clarification, and at times benefitted appellant. Moreover, a trial court that was biased against appellant would arguably not have been as encouraging to appellant as this trial court was during the sentencing hearing. In fact, the trial court had the option of being far more heavy-handed with its sentence than it was in this case. It follows that appellant has failed to establish that the trial court committed plain error, let alone structural error, in the manner by which it interrogated witnesses.

{¶ 51} Based on the foregoing, appellant's third assignment of error is overruled.

{¶ 52} In his fourth assignment of error, appellant contends he received ineffective assistance of counsel when counsel elicited other-acts evidence on cross-examination. "Decisions regarding cross-examination are within the trial counsel's discretion and generally do not form the basis for a claim of ineffective assistance of counsel." *State v. Hunt*, 2013-Ohio-5326, ¶ 116 (10th Dist.). This court has consistently held that the extent and scope of defense counsel's cross-examination clearly fall within the ambit of trial strategy. *State v. Zhu*, 2021-Ohio-4577, ¶ 61 (10th Dist.). Thus, "[a]n appellate court reviewing an ineffective assistance of counsel claim must not scrutinize trial counsel's strategic decision to engage, or not engage, in a particular line of questioning on cross-examination." *In re Brooks*, 2004-Ohio-3887, ¶ 40 (10th Dist.).

{¶ 53} Despite the aforementioned case law, assuming, arguendo, that trial counsel's performance was deficient, appellant cannot establish that he was prejudiced by that performance. As previously discussed, the admission of other-acts evidence at the trial

in this matter did not affect the outcome of the case. The trial court only briefly discussed this evidence in its reasoning for the verdict. Moore's testimony alone overwhelmingly supported the trial court's findings of guilt. Also, as previously noted, the references to any prior bad acts committed by appellant were vague and dissimilar to the allegations in this case. Finally, the testimony regarding other legal issues elicited by counsel actually benefitted appellant. As we previously noted, in its reasoning, the trial court did not find appellant's avoidance of law enforcement persuasive evidence of consciousness of guilt. This was in part due to the other-acts evidence. It follows that appellant has failed to sustain his burden on the second prong of the *Strickland* test.

{¶ 54} Based on the foregoing, appellant's fourth assignment of error is overruled.

## V. CONCLUSION

{¶ 55} Having overruled each of appellant's four assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BOGGS, P.J., and DINGUS, J., concur.

_____