[Cite as *State v. Poole*, 2026-Ohio-2270.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                  :

      Plaintiff-Appellee,           :                    No. 23AP-271
                                                                      (C.P.C. No. 20CR-4870)
v.                                             :
                                                                   (REGULAR CALENDAR)
Q'Juantez L. Poole,                            :

      Defendant-Appellant.          :

---

D E C I S I O N

Rendered on June 16, 2026

---

**On brief:** *Shayla D. Favor*, Prosecuting Attorney, and *Darren M. Burgess*, for appellee. **Argued:** *Darren M. Burgess.*

**On brief:** *The Law Office of Thomas F. Hayes, LLC*, and *Thomas F. Hayes*, for appellant. **Argued:** *Thomas F. Hayes.*

---

APPEAL from the Franklin County Court of Common Pleas

DINGUS, J.

{¶ 1} Defendant-appellant, Q'Juantez L. Poole, appeals a judgment of the Franklin County Court of Common Pleas that convicted and sentenced him for murder, attempted murder, and tampering with evidence, along with the attendant specifications. For the following reasons, we affirm that judgment.

## I. Facts and Procedural History

{¶ 2} In the autumn of 2020, defendant's older brother, Quintez Poole ("Quintez"), lived in a two-story apartment on Arborwood Drive, a four-unit brick apartment building in Columbus. The front door of Quintez's apartment, which faced west, opened onto a covered cement patio and faced a grassy courtyard. Arborwood Drive, which ended in a cul-de-sac, abutted the south side of the apartment. Along the back, or east side, of

Quintez's apartment ran a driveway that extended from Arborwood Drive to a parking lot that lay on the north side of the apartment building.

{¶ 3} Quintez affixed four security cameras to the outside of his apartment. One camera pointed toward the front door and the courtyard in front of the apartment. Two cameras recorded the cul-de-sac. One of these two cameras also captured the apron of the driveway behind Quintez's apartment. The final camera, mounted above the back door of the apartment, showed part of the driveway near the parking lot.

{¶ 4} At 10:40 p.m. on October 6, 2020, the back door camera recorded a Chrysler 300, driven by Dontey Wiley, stopping on the driveway immediately behind Quintez's apartment. A minute later, an SUV passed Wiley's vehicle and parked in the lot north of Quintez's apartment building. Kari Anderson-Latham exited the SUV, walked to Wiley's vehicle, and got in the passenger seat. Wiley and Latham spent the next hour sitting together in Wiley's parked vehicle.

{¶ 5} At 11:37 p.m., the Chrysler 300 drove away. However, it returned to the same position behind Quintez's apartment at 11:44 p.m. Again, Wiley and Latham remained sitting in the parked vehicle. About a minute after the Chrysler 300's return, Quintez exited his back door and stood looking at the vehicle. Quintez then walked around his apartment building and entered his front door.

{¶ 6} Soon after, defendant received a phone call summoning him to his brother's Arborwood apartment. Quintez's video surveillance showed defendant arriving at Arborwood Drive in his Honda Civic at 12:26 a.m. on October 7, 2020. Defendant remained in his vehicle as Quintez ushered his fiancée and two children out of the apartment and loaded them into Quintez's vehicle. Quintez's fiancée then drove the two children to defendant's apartment. Quintez joined defendant in defendant's vehicle.

{¶ 7} At 12:29 a.m., defendant drove away from the Arborwood apartment. But a little over two minutes later, the headlights of defendant's Honda Civic again appeared on the security footage. Defendant paused his vehicle for approximately ten seconds before driving at "a good little clip" through the cul-de-sac and onto the driveway behind Quintez's apartment. (Jan. 31, 2023 Tr. Vol. I at 89.)

{¶ 8} What happened next occurred within a blind spot in the security cameras' coverage. However, based on the positioning of the vehicles' head and taillights, defendant

appeared to stop his Honda Civic next to the Chrysler 300. The two vehicles then remained stationary for seven seconds. During those seven seconds, one of the security cameras recorded multiple flashes of light consistent with muzzle flashes. The flashes began within a second of the Honda Civic stopping.

{¶ 9} After seven seconds, defendant drove his Honda Civic forward while Wiley reversed his Chrysler 300 down the driveway and onto Arborwood Drive. The rear of the Chrysler 300 struck a vehicle parked on Arborwood Drive, then rolled forward. As the Chrysler 300 started rolling forward, the driver's door opened, and Wiley tumbled out. The Chrysler 300 continued coasting for about 100 feet before losing momentum.

{¶ 10} In the meantime, defendant drove around Quintez's apartment building and through the grassy courtyard in front of the apartment building. As defendant rounded the northwest corner of the apartment building and approached Arborwood Drive, he extended his left arm out of his driver's side window and fired a handgun toward the Chrysler 300 as it coasted, driverless. The muzzle flash from defendant's handgun is visible on the security video. Defendant then drove onto Arborwood Drive and away from the scene.

{¶ 11} Latham, the passenger in the Chrysler 300, called 9-1-1 from a neighbor's apartment. She reported to the 9-1-1 operator that she "was just sitting in the car with [her] friend, and they started shooting at us." (Pl.'s Ex. A11 at 0:10.) Latham also told the 9-1-1 operator that she thought her friend was shot, and she was bleeding. She asked the 9-1-1 operator to "please just send somebody." *Id.* at 1:05.

{¶ 12} Officer Michael Secrest of the Columbus Division of Police arrived at Arborwood Drive in response to Latham's 9-1-1 call. He found Wiley lying on the street, shot multiple times, but alive and conscious.

{¶ 13} Wiley's Chrysler 300 had several bullet holes in the driver-side door. The driver-side window was shattered, pockmarked with at least four large holes, but it remained intact because the window tint held it together. The window, however, lost its rigidity and partially dropped out of the frame, sagging against the driver's side door.

{¶ 14} In reply to Officer Secrest's questioning, Wiley stated that he did not know what happened, and he did not know who shot him. Officer Secrest also spoke to Latham and observed a wound on Latham's back that was consistent with a graze from a bullet.

Emergency medical personnel transported Wiley to the hospital, where he ultimately died from multiple gunshot wounds.

{¶ 15} While police and emergency medical personnel responded to Arborwood Drive, defendant drove his brother to Dublin Methodist Hospital. Quintez had sustained a gunshot wound to the groin, and he was unconscious by the time defendant dragged him into the emergency room. Although seriously injured, Quintez survived his wounds.

{¶ 16} When officers from the Columbus Division of Police responded to Dublin Methodist Hospital, they discovered defendant's Honda Civic parked in front of the emergency room doors. Both the front and rear passenger-side windows were shattered, and multiple bullet holes punctured the front passenger-side door. Additionally, numerous spent casings and shotgun shells were scattered throughout defendant's vehicle. Later, after processing the vehicle, the police collected a total of 16 spent 9 mm casings and 3 spent 12-gauge shotgun shells from the Honda Civic.

{¶ 17} Given Quintez's condition, the bullet holes in defendant's vehicle, and the spent casings and shells found inside the vehicle, the Columbus Division of Police detained defendant. In the early morning of October 7, 2020, two detectives from the Columbus Division of Police, including Detective Michael A. Huffman, interviewed defendant. Initially, defendant told the detectives that he had driven to his brother's Arborwood apartment the previous night to pick his brother up. He said he stopped his vehicle on the driveway behind his brother's apartment next to the Chrysler 300. Quintez then exited his apartment through the back door, walked to the passenger door of the Honda Civic, entered the vehicle, and sat in the passenger seat. Defendant claimed that before he could drive off, Wiley began shooting into defendant's vehicle, and Quintez yelled that he had been shot. Defendant said that neither he nor his brother returned fire, and he denied having any guns.

{¶ 18} Defendant explained that he did not know who was in the Chrysler 300 because the windows were tinted, preventing him from seeing inside. Based on the number of shots he heard, however, he believed that more than one person was shooting from the Chrysler 300 at his vehicle.

{¶ 19} As the detectives continued to question defendant, he began giving equivocal answers regarding his brother's possession of a gun and involvement in the shooting. Defendant said he "c[ould]n't say whether or not if [his brother] had a gun or not." (Pl.'s

Ex. U at 17:48.) And he told the detectives that he "c[ould]n't say" whether his brother had fired a gun in defendant's vehicle. *Id.* at 20:59. After continued pressure from the detectives, defendant conceded that his brother had "possibly" returned fire after he was shot. *Id.* at 28:29.

{¶ 20} Finally, defendant admitted to the detectives that *he* shot at the Chrysler 300. Defendant's second version of events began the same as his first: he arrived at his brother's Arborwood apartment and stopped his Honda Civic next to the Chrysler 300, and after Quintez got into defendant's vehicle, Wiley started shooting. Defendant said that he then shot back at the Chrysler 300 with a 9 mm handgun that he owned. Defendant explained that he loaded his gun before getting to the Arborwood apartment, and he had his loaded gun in the driver's side door pocket.

{¶ 21} Defendant denied shooting at the Chrysler 300 again after the initial round of shots. He also claimed that his brother did not shoot at the Chrysler 300, and "[n]o other shots were fired other than mine." *Id.* at 34:57. When the detectives confronted him with a photograph of one of the spent shotgun shells found in his vehicle, defendant maintained there was no shotgun involved in the shooting.

{¶ 22} After interviewing defendant, Detective Huffman requested that police officers search the area near Dublin Methodist Hospital for a 9 mm handgun and a shotgun. In a field bordering an access road to the hospital, police officers found both firearms. The firearms were located together at the base of a tree "in pretty heavy brush." (Feb. 1, 2023 Tr. Vol. II at 392.)

{¶ 23} On October 15, 2020, defendant was indicted on five counts:

- Count 1—murder, an unclassified felony in violation of R.C. 2903.02, along with firearm specifications pursuant to R.C. 2941.145(A) and 2941.146(A);

- Count 2—murder, an unclassified felony in violation of R.C. 2903.02, along with firearm specifications pursuant to R.C. 2941.145(A) and 2941.146(A);

- Count 3—attempted murder, a first-degree felony in violation of R.C. 2903.02 and 2923.02, along with firearm specifications pursuant to R.C. 2941.145(A) and 2941.146(A);

- Count 4—felonious assault, a second-degree felony in violation of R.C. 2903.11, along with firearm specifications pursuant to R.C. 2941.145(A) and 2941.146(A), and;

- Count 5—tampering with evidence, a third-degree felony in violation of R.C. 2921.12, along with a firearm specification pursuant to R.C. 2941.141(A).

{¶ 24} Defendant pleaded not guilty. Defendant subsequently gave notice, pursuant to Crim.R. 12.2, that he intended to offer evidence or argue at trial that he acted in self-defense and/or in the defense of another.

{¶ 25} During trial, plaintiff-appellee, State of Ohio, introduced testimony, video, and audio evidence to demonstrate the facts set forth above. Additionally, the state offered testimony from Detective Suzanne Nissley, who recovered a 9 mm semi-automatic handgun from the driver's seat of the Chrysler 300. Qualified as an expert in weapons specific to this case at defendant's request, Detective Nissley testified that the 9 mm handgun contained a 12-round magazine. Detective Nissley also testified that one spent casing remained in the handgun, and one unfired cartridge remained in the magazine.

{¶ 26} Furthermore, Detective Nissley stated that the trigger guard of the 9 mm handgun was damaged from a bullet strike. According to Detective Nissley, the shooter was likely holding the handgun when a bullet fired from defendant's Honda Civic struck the trigger guard, injuring the shooter's thumb and causing him to recoil. (According to the coroner's report, Wiley sustained a one and a half inch laceration to the base of his right thumb.) When the shooter recoiled, the handgun's slide could not move backward to eject the casing, causing the handgun to jam. Once the handgun jammed, the shooter could not fire it.

{¶ 27} In addition to Detective Nissley, the state called Detective Sontino Williams. He testified that he inspected defendant's Honda Civic to determine whether the front passenger-side window was up or down when it shattered. That inspection required Detective Williams to disassemble the front passenger-side door panel. Detective Williams discovered that the window regulator, the mechanism that lowered and raised the window, was low in the door, meaning the window was down. Detective Williams also found a significant amount of window glass inside the front passenger-side door. Given the position

of the window regulator and the amount of window glass inside the door, Detective Williams determined that the front passenger-side window was down when it shattered.

{¶ 28} Brian Johnson, a firearms examiner with the Columbus Division of Police Crime Laboratory, testified for the state as well. The parties stipulated that Johnson was an expert in the areas of firearms, ballistics, and forensic sciences. Johnson explained that he compared test fires from the 9 mm handgun and the shotgun recovered from the field near Dublin Methodist Hospital with the spent casings and spent shotgun shells recovered from defendant's Honda Civic. Johnson opined that to a reasonable degree of scientific certainty, the 16 spent casings all came from the 9 mm handgun, and the 3 spent shotgun shells all came from the shotgun.

{¶ 29} Finally, the parties stipulated that if Amanda Fashano, a forensic scientist at the Columbus Division of Police Crime Laboratory, would testify, she would state that to a reasonable degree of scientific certainty, defendant was a contributor to the DNA found on the 9 mm handgun recovered from the field near Dublin Methodist Hospital. She would also testify that to a reasonable degree of scientific certainty, Quintez was a contributor to the DNA found on the shotgun recovered from the field near Dublin Methodist Hospital.

{¶ 30} Defendant testified on his own behalf at trial. He said he drove to Quintez's apartment after receiving a phone call from Quintez's fiancée. After Quintez helped his fiancée load their children into their vehicle, Quintez got into defendant's vehicle. To defendant, Quintez seemed "[n]ervous, panicked, maybe suspicious, even paranoid." (Feb. 2, 2023 Tr. Vol. III at 709.) Quintez had been watching the Chrysler 300 on his security cameras, and the occupants' actions worried him. Defendant drove away from the Arborwood apartment, but Quintez wanted to return "to see if the car was still there, if it had left, they had gotten out of the car, maybe if they had broken into his house, just a lot of different reasons." Id. at 710. Defendant turned around and drove back to Arborwood Drive.

{¶ 31} Defendant testified that while "driving to see who was in [Wiley's] car, next to the car, [he] was not paying attention to anything that was going on between [his] brother or the car. [He] heard gunshots. [He] felt the impact of the bullets hitting [his] car and [he] heard [his] glass shatter." Id. at 713. Defendant then heard Quintez say, "[B]ro, he

shot me in the dick." *Id.* at 714. According to defendant, at that point, he "reached down, grabbed [his] gun, and [he] returned fire." *Id.*

{¶ 32} Defendant admitted that Quintez shot a shotgun at the Chrysler 300. Defendant testified that he did not know if Quintez or Wiley shot first. Defendant said that when he pulled the trigger on his gun, he was doing so to defend himself and Quintez.

{¶ 33} Although defendant owned the shotgun Quintez fired, defendant said he did not have it with him when he drove to Quintez's apartment. Defendant testified that he had left the shotgun with Quintez after the brothers visited an outdoor shooting range, and Quintez brought the shotgun with him the night of the shooting. Defendant, however, denied seeing that Quintez was carrying the three-foot long shotgun when he entered defendant's vehicle that night.

{¶ 34} After defendant and Quintez initially shot at the Chrysler 300, defendant circled around the Arborwood apartment building. As defendant approached Arborwood Drive, he saw the Chrysler 300 "pulling back forward, [and] seeing the headlights coming forward, [he thought] that the 300 C was coming towards [him,] and [he] fired another round." *Id.* at 722-723. Defendant testified that he also fired that round in self-defense.

{¶ 35} While driving Quintez to Dublin Methodist Hospital, defendant stopped at "a grassy area" to deposit the 9 mm handgun and the shotgun. *Id.* at 724. Defendant said that he did not want to carry a handgun and a shotgun into a hospital, "knowing that a lot of times at hospitals there are armed officers or some type of security where [he] could have made a threat in a situation where [he] was not a threat. [He] was just trying to drop [his] brother off at the hospital." *Id.* at 725. Defendant claimed that, at the time he left the firearms in the field, he did not think that an investigation into the shooting that occurred that night was likely.

{¶ 36} Defendant admitted that he did not tell the truth when interviewed by the police. He said that he was scared during the interview, and he did not exercise the best judgment in answering certain questions. Defendant denied lying to the jury when testifying on the stand.

{¶ 37} After deliberating, the jury found defendant guilty of all five counts, including all the attendant firearm specifications for each count. In a judgment dated April 5, 2023, the trial court merged Counts 1 and 2 (the two murder counts), as well as Counts 3 and 4

(the counts for attempted murder and felonious assault). The state elected that the trial court sentence defendant for Count 1 (murder) and Count 3 (attempted murder).

{¶ 38} The trial court sentenced defendant to:

- Count 1 (murder)—15 years to life in prison, plus an additional 60 months for the firearm specification pursuant to R.C. 2941.146(A), known as the "drive-by shooting" specification;

- Count 3 (attempted murder)—4 years in prison, plus an additional 3 years for the firearm specification pursuant to R.C. 2941.145(A), to be served consecutively to Count 3; and

- Count 5 (tampering with evidence)—24 months in prison, plus an additional 1 year for the firearm specification pursuant to R.C. 2941.141(A), to be served concurrently with Count 5.

The trial court ordered defendant to serve all counts consecutive with each other. According to the trial court, defendant's total sentence amounted to life imprisonment with eligibility for parole after a minimum of 27 years and a maximum of 29 years.

## II. Assignments of Error

{¶ 39} Defendant now appeals the April 5, 2023 judgment, and he assigns the following five errors for our review:

> [I.] The trial court erred in omitting a key self-defense element in the jury instructions.
>
> [II.] The trial court violated Mr. Poole's right to confront witnesses in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution by allowing the introduction of the entire 911 call.
>
> [III.] Mr. Poole was deprived of effective assistance of counsel due to trial counsel performance.
> a. Failure to object to improper jury instructions.
> b. Failure to object to opinion testimony by Detective Huffman that Mr. Poole was not forthcoming in the investigation and that Mr. Poole did not act in self-defense or in defense of another.
> c. Totality of counsel performance.

[IV.] The conviction was against the manifest weight of the evidence and based upon insufficient evidence in violation of Mr. Poole's right to due process as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution.

[V.] The trial court erred in sentencing Mr. Poole to multiple consecutive prison terms for gun specifications, one of which is not part of the list of gun specifications contained in the statutory exception against consecutive sentences for gun specifications.

## III. Discussion

### A. First Assignment of Error – Self-Defense Jury Instruction

{¶ 40} By his first assignment of error, defendant argues the trial court erred by omitting a necessary instruction to the jury on self-defense. We disagree.

{¶ 41} Traditionally, a self-defense claim includes three elements: (1) the defendant was not at fault in creating the situation giving rise to the affray, (2) the defendant had a bona fide belief he or she was in imminent danger of death or great bodily harm and his or her only means of escape from such danger was in the use of deadly force, and (3) the defendant did not violate any duty to retreat or avoid danger. *State v. Messenger*, 2022-Ohio-4562, ¶ 14. When instructing the jury regarding the second element of self-defense, the trial court stated:

> In determining whether the Defendant had reasonable ground for an honest belief that he was in imminent danger, you must put yourself in the position of the Defendant with his characteristics, his knowledge or lack of knowledge, and under the circumstances and conditions that surrounded him at that time. You must consider the conduct of Dontey Wiley who was assaulted and determine if his acts and words caused the Defendant to reasonably and honestly believe that he was about to be killed or to receive great bodily harm.

(Feb. 3, 2023 Tr. Vol. IV at 933.)

{¶ 42} Defendant does not argue this instruction misstates the law applicable to the second element of self-defense. Rather, defendant contends the trial court should have additionally instructed the jury to consider the conduct of Latham, and whether her acts and words caused defendant to reasonably and honestly believe he was about to be killed

or receive great bodily harm.  Defendant asserts the trial court's failure to so instruct the jury rendered the instructions incomplete and, thus, legally inaccurate.

{¶ 43} Defendant did not object to this portion of the jury instructions before the trial court.  Pursuant to Crim.R. 30(A), "[o]n appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Where a defendant fails to object to the jury instruction he challenges on appeal, he waives all but plain error. *State v. Gaspar*, 2024-Ohio-4782, ¶ 14; *State v. Smith*, 2025-Ohio-4556, ¶ 23 (10th Dist.).

{¶ 44} To demonstrate plain error, a defendant must establish that an error occurred, the error was obvious, and there is a reasonable probability the error resulted in prejudice, meaning the error affected the outcome of the trial.  *State v. Bailey*, 2022-Ohio-4407, ¶ 8.  Correction of error under the plain-error doctrine "is warranted only under exceptional circumstances to prevent injustice." *Id*. at ¶ 15.

{¶ 45}  A trial court "must give all instructions that are relevant and necessary for the jury to weigh the evidence and discharge its duty as the factfinder."  *State v. Joy*, 1995-Ohio-259, ¶ 13.  Conversely, a trial court "may refuse to give an instruction which is not applicable to the evidence governing the case[.]"  *State v. Cross*, 58 Ohio St.2d 482, 488 (1979); *accord Cromer v. Children's Hosp. Med. Ctr.*, 2015-Ohio-229, ¶ 33 (holding that "a trial court should limit its instructions to the jury to matters actually raised . . . in the evidence at trial"); *State v. Hall*, 2023-Ohio-837, ¶ 35 (10th Dist.), quoting *State v. Mankin*, 2020-Ohio-5317, ¶ 34 (holding that a " 'trial court will not instruct the jury where there is no evidence to support an issue' ") (further quotation marks deleted and citation omitted). In short, a jury instruction must "present a correct, pertinent statement of the law that is appropriate to the facts." *State v. White*, 2015-Ohio-492, ¶ 46.

{¶ 46}  In this case, defendant asserts the trial court erred in not instructing the jury to consider Latham's conduct because evidence introduced at trial supported the inference that she, in addition to Wiley, shot at defendant's vehicle.  To establish this inference, defendant first points to the testimony of Detective Donald Jones, who identified eight

bullet strikes on the passenger side of defendant's Honda Civic.[1]  Defendant then turns to the 9 mm handgun recovered from the Chrysler 300, which presumably caused those bullet strikes.  Defendant maintains the 9 mm handgun recovered from the Chrysler 300 contained a magazine with a capacity of six rounds.  Fully loaded, i.e., with a round in the chamber, a 9 mm handgun with a six-round magazine would have the capacity to shoot seven rounds before the shooter would have to reload.  But the 9 mm handgun recovered from the Chrysler 300 had one live round left in the magazine.  Defendant, therefore, deduces that Wiley only fired six shots from the 9 mm handgun, which he surmises accounts for six of the bullet strikes on defendant's Honda Civic.  According to defendant, Latham must have fired a second gun to produce the two other bullet strikes on defendant's vehicle.

{¶ 47} Defendant's logic rests on a faulty premise.  Detective Nissley testified that the magazine in the 9 mm handgun recovered from the Chrysler 300 was a 12-round magazine, not a 6-round magazine.  Under questioning from defense counsel, Detective Nissley explained that with a 12-round magazine, the 9 mm handgun could fire 13 rounds without reloading.  Consequently, even taking into consideration the unfired round, the 9 mm handgun could hold enough ammunition to cause the 8 bullet strikes on defendant's Honda Civic.  The record, therefore, contains no evidence from which to infer that Latham had a second gun that she used to shoot at the Honda Civic.

{¶ 48} With no evidence that Latham assaulted defendant, the trial court did not err, much less commit plain error, in omitting Latham from the self-defense instruction.  Accordingly, we overrule defendant's first assignment of error.

## B. Second Assignment of Error − Violation of Right to Confront Witnesses

{¶ 49}  By defendant's second assignment of error, he argues the admission of Latham's 9-1-1 call into evidence violated his right to confront witnesses in violation of the

---

[1] On cross-examination, Detective Jones admitted that some of the bullet strikes he identified were not full penetrations but, rather, indentations that could have been caused by something other than a bullet, like flying debris. Detective Nissley testified that she observed *six* bullet strikes to the passenger side of the Honda Civic. The photographs of the passenger side of the Honda Civic show six—not eight—apparent bullet holes.

Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 to the Ohio Constitution.[2] We disagree.

{¶ 50} The Sixth Amendment to the United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The procedural guarantee found in the Confrontation Clause applies to both federal and state prosecutions. *Crawford v. Washington*, 541 U.S. 36, 42 (2004). Appellate courts review evidentiary rulings that implicate the Confrontation Clause de novo. *State v. Smith*, 2024-Ohio-5745, ¶ 32.

{¶ 51} The Confrontation Clause applies only to a specific subset of hearsay; namely, testimonial hearsay. *Crawford* at 51. If an out-of-court statement is testimonial, the Confrontation Clause bars its admission unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. *Id.* at 53-54. A statement is testimonial when it is made for " 'a primary purpose of creating an out-of-court substitute for trial testimony.' " *State v. Montgomery*, 2016-Ohio-5487, ¶ 87, quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011).

{¶ 52} Determining whether a statement is testimonial often turns on whether an ongoing emergency existed at the time of the encounter between the declarant and the police. The United States Supreme Court has clarified that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis v. Washington*, 547 U.S. 813, 822 (2006). "The existence of an ongoing emergency is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than 'prov[ing] past events potentially relevant to later criminal prosecution.' " *Bryant* at 361, quoting *Davis* at 822. "[A]n ongoing emergency renders a statement

---

[2] Although defendant claims the admission of Latham's 9-1-1 call violated his confrontation rights under Article I, Section 10 to the Ohio Constitution, his legal argument only relies on federal Sixth Amendment case law. Article I, Section 10 to the Ohio Constitution provides that a criminal defendant "shall be allowed . . . to meet the witnesses face to face." The Supreme Court of Ohio has interpreted this provision "in lockstep" with the United State Supreme Court's interpretation of the Sixth Amendment. *State v. Carter*, 2024-Ohio-1247, ¶ 34. We, therefore, review defendant's state constitutional claim under the federal standard.

nontestimonial when the victim makes [that] statement to an operator during a 9-1-1 call." *State v. Wilcox*, 2024-Ohio-5719, ¶ 12.

{¶ 53} A court must objectively measure the primary purpose of the statement, accounting for the perspectives of both the interrogator and the declarant. *Id.* at ¶ 11. "[T]he relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Bryant* at 360.

{¶ 54} In this case, the state introduced the entirety of Latham's 9-1-1 call into evidence. The 9-1-1 call began:

> Operator: 9-1-1. What's the location of your emergency?
>
> Latham: I'm at Arborwood Drive. I don't know the address. I was just sitting in the car with my friend, and they started shooting at us.

(Pl.'s Ex. A11 at 0:08.) Defendant argues Latham's last sentence is testimonial and, thus, its admission into evidence violated the Confrontation Clause.

{¶ 55} At the time of Latham's 9-1-1 call, Latham had fled Wiley's vehicle and sought shelter in a nearby apartment. Wiley was lying on Arborwood Drive, bleeding from multiple gunshot wounds. During the 9-1-1 call, Latham told the operator that she and Wiley had been shot. She asked for the 9-1-1 operator to "please just send somebody." *Id.* at 1:05.

{¶ 56} Fundamentally, Latham called 9-1-1 seeking emergency law enforcement and medical assistance. Latham began the 9-1-1 call by voluntarily describing the drive-by shooting to the 9-1-1 operator in order to obtain emergency assistance. Although defendant and Quintez had fled, they remained a potential threat to the police and public as armed, at-large perpetrators of a drive-by shooting. In addition, Wiley and Latham, who had both suffered gunshot wounds, needed emergency medical services. Viewing the then-existing circumstances and the statements on the 9-1-1 call objectively, we conclude the primary purpose of Latham's statement was to enable police and emergency medical services to handle the ongoing emergency. Latham's statement was not elicited with the primary purpose of preserving her testimony for trial.

{¶ 57} Defendant, however, argues no ongoing emergency existed because defendant, Quintez, and Latham had left the scene. This argument unduly restricts what constitutes an ongoing emergency. An ongoing emergency can exist after the original threat has ended if a potential threat to police or the public remains, or if a victim needs emergency medical services. *State v. Jacinto*, 2020-Ohio-3722, ¶ 65 (8th Dist.); *State v. Conyer*, 2017-Ohio-7506, ¶ 16 (7th Dist.); *accord Bryant*, 562 U.S. at 373 ("An emergency does not last only for the time between when the assailant pulls the trigger and the bullet hits the victim."); *State v. Hollingsworth*, 2026-Ohio-659, ¶ 38 (10th Dist.) (holding "statements made during a 9-1-1 call a short period of time after a shooting, when the suspect has not been apprehended, are [not] rendered testimonial simply because the involved parties are no longer at the scene").

{¶ 58} Next, defendant asserts Latham did not need to make the statement she made about the shooting in order to obtain emergency assistance. Defendant argues this unnecessary statement is not testimonial because the state used it to disprove his claim of self-defense. This argument misses the point. To determine whether the Confrontation Clause bars the admission of a statement at trial, we must conduct a primary-purpose assessment, not review the evidentiary value of the statement in the context of the trial. *Bryant* at 370; *accord Jacinto* at ¶ 65 ("[W]hen determining whether a 911 caller's statements are testimonial or nontestimonial, the issue is not whether the statements would 'be relevant' in later criminal proceedings. The issue is the 'primary purpose' for which the statements are made."). Regardless of whether Latham needed to say what she said, we conclude she made her statement in an ongoing emergency for the primary purpose of seeking police and medical assistance.

{¶ 59} Given Latham's primary purpose, the disputed statement was nontestimonial. Accordingly, admission of the statement did not violate the Confrontation Clause, and we thus overrule defendant's second assignment of error.

## C. Third Assignment of Error – Ineffective Assistance of Counsel

{¶ 60} By defendant's third assignment of error, he argues he was deprived of effective assistance of counsel. We disagree.

{¶ 61} To prevail on an ineffective assistance claim, a defendant must meet the two-prong test set out in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the defendant

must show that counsel's performance was deficient. *Strickland* at 687; *State v. Bradley*, 42 Ohio St.3d 136, 141 (1989). To meet that requirement, the defendant must demonstrate counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland* at 687. Counsel's conduct is deficient if it falls below an objective standard of reasonable representation. *Strickland* at 688; *Bradley* at 142.

{¶ 62} If the defendant shows counsel's performance was deficient, then the second prong of the *Strickland* test requires the defendant to prove prejudice to prevail. *Strickland* at 687; *Bradley* at 141-142. To demonstrate prejudice, the defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694; *accord Bradley* at 142.

{¶ 63} Defendant first argues his trial counsel was ineffective for not objecting to the jury instruction on self-defense and insisting the trial court instruct the jury to consider the conduct of Latham, and whether her acts and words caused defendant to reasonably and honestly believe he was about to be killed or receive great bodily harm. A trial counsel is not deficient for failing to request an instruction the evidence does not warrant. *State v. Ferrell*, 2020-Ohio-6879, ¶ 48-49 (10th Dist.); *State v. Darby*, 2011-Ohio-3816, ¶ 49 (10th Dist.). As we explained in our analysis of the first assignment of error, the evidence did not support an instruction regarding Latham's conduct. Therefore, we conclude defendant's trial counsel was not deficient for failing to object to the self-defense instruction and demand language instructing the jury to consider Latham's conduct.

{¶ 64} Next, defendant argues his trial counsel was ineffective for failing to object to the opinion testimony of Detective Huffman. We do not find this argument persuasive.

{¶ 65} A failure to object does not constitute deficient performance if the evidence at issue is admissible. *State v. O.E.P.-T.*, 2023-Ohio-2035, ¶ 177 (10th Dist.). Additionally, a failure to object will not amount to ineffective assistance of counsel unless the defendant demonstrates a reasonable probability that, but for his trial counsel's failure to object, the result of the proceedings would have been different. *State v. Whitfield*, 2025-Ohio-4957, ¶ 35 (10th Dist.); *State v. Thompson*, 2019-Ohio-2525, ¶ 15 (10th Dist.).

{¶ 66} As we explained above, Detective Huffman and another detective interviewed defendant on the morning of October 7, 2020 about the shooting. After the jury viewed a video of defendant's interview, Detective Huffman testified as follows:

> Q. . . . In your training and experiences as a police officer, what were your impressions during that interview?
>
> A. He was not being very forthcoming. He didn't come across to me as being anybody [who] had been shooting in self-defense. It just -- the interview just didn't sit right with either one of us when we were in that room.

(Tr. Vol. III at 580.)

{¶ 67} According to defendant, his trial counsel should have objected after Detective Huffman stated, "He didn't come across to me as being anybody [who] had been shooting in self-defense." *Id.* Defendant contends Detective Huffman impermissibly offered a lay opinion on an ultimate issue before the jury, i.e., whether defendant acted in self-defense.

{¶ 68} Lay witnesses, including police officers, may offer opinion testimony if the testimony meets the Evid.R. 701 requirements. *State v. Garrett*, 2022-Ohio-4218, ¶ 190; *accord State v. Tatum*, 2011-Ohio-907, ¶ 17 (10th Dist.) ("It is well-settled that a police officer may testify concerning matters that are within his experience and observations that may aid the trier of fact in understanding the other testimony pursuant to Evid.R. 701."). Evid.R. 701 states:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

{¶ 69} Here, Detective Huffman was asked about his impressions of defendant based on defendant's interview. Detective Huffman gave his impression: defendant did not "come across" to Detective Huffman as someone who shot in self-defense. (Tr. Vol. III at 580.) Detective Huffman premised his opinion only on what he perceived—defendant's demeanor and statements in the interview. Consequently, Detective Huffman's testimony was rationally based on his perception, as required by Evid.R. 701(1).

{¶ 70} Thus, we turn to addressing whether Detective Huffman's testimony was helpful to the jury's understanding of a fact in issue, as required by Evid.R. 701(2). We

conclude that Detective Huffman's opinion provided a useful perspective for analyzing defendant's interview. Defendant disagrees, contending Detective Huffman's opinion attempted to dictate a conclusion to the jury on an ultimate issue—whether defendant acted in self-defense. Opinion testimony, however, "is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." Evid.R. 704. Moreover, Detective Huffman did not directly testify to the ultimate issue before the jury because Detective Huffman based his opinion on limited and, as defendant admitted to the jury, false information. Having seen the interview video and heard from defendant himself, the jury was aware of the shortcomings inherent in Detective Huffman's opinion. We, therefore, are not convinced Detective Huffman's testimony was inadmissible evidence.

{¶ 71} Moreover, even if we were to agree with defendant that his trial counsel was deficient, we find Detective Huffman's opinion testimony is not so prejudicial to defendant that it changed the outcome of the trial. The jury viewed the interview video itself and, thus, it could form its own opinion of whether it concurred with Detective Huffman's perception of defendant. Furthermore, as we will discuss below, even without considering Detective Huffman's testimony, the manifest weight of the evidence supports defendant's convictions because the state proved beyond a reasonable doubt that defendant did not act in self-defense. We, therefore, conclude defendant has not demonstrated that his trial counsel provided ineffective assistance when he failed to object to Detective Huffman's testimony.

{¶ 72} Finally, defendant argues that his trial counsel was ineffective based on the cumulative effect of his errors during trial. Under the cumulative-error doctrine, an appellate court will reverse a conviction "when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous errors does not individually constitute cause for reversal." *State v. Graham*, 2020-Ohio-6700, ¶ 169. However, "when none of the individual claims of ineffective assistance of counsel have merit, cumulative error cannot be established simply by joining those meritless claims together." *Id.* at ¶ 170. In this case, we have found no merit in any of defendant's claims for ineffective assistance of counsel and, thus, we reject his claim that the cumulation of his counsel's alleged errors resulted in ineffective assistance.

{¶ 73} In sum, defendant has failed to demonstrate that his trial counsel provided ineffective assistance. Accordingly, we overrule defendant's third assignment of error.

**D. Fourth Assignment of Error – Sufficiency of the Evidence and Manifest Weight of the Evidence**

{¶ 74} By defendant's fourth assignment of error, he argues his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. We disagree.

{¶ 75} Defendant claimed self-defense in response to the charges of murder, attempted murder, and felonious assault. "[A] defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that the defendant's use of force was in self-defense." *Messenger*, 2022-Ohio-4562, at ¶ 25. If the defendant satisfies this burden, then the state must disprove at least one of the elements of self-defense beyond a reasonable doubt. *State v. Ross*, 2025-Ohio-2875, ¶ 46 (10th Dist.); *State v. Patterson*, 2025-Ohio-280, ¶ 60 (10th Dist.). "The state's [] burden of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to a manifest-weight review on appeal." *Messenger* at ¶ 27.

{¶ 76} When an appellate court reviews whether a conviction is against the manifest weight of the evidence, " '[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving the conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, 1997-Ohio-52, ¶ 25, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). "Sitting as the 'thirteenth juror,' the court of appeals considers whether the evidence should be believed and may overturn a verdict if it disagrees with the trier of fact's conclusion." *State v. Jordan*, 2023-Ohio-3800, ¶ 17. However, the appellate court's authority to reverse on manifest-weight grounds " 'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at ¶ 25, quoting *Martin* at 175.

{¶ 77} Self-defense claims generally turn on credibility issues. *Patterson* at ¶ 45; *State v. Blacker*, 2024-Ohio-5611, ¶ 103 (10th Dist.). Evaluation of witnesses' credibility for the purposes of determining a self-defense claim is best done by the trier of fact. *Patterson* at ¶ 45; *Blacker* at ¶ 103. A trier of fact is in the best position to consider inconsistencies in witnesses' accounts, along with witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible. *Patterson* at ¶ 45; *Blacker* at ¶ 103.

A conviction is not against the manifest weight of the evidence because a trier of fact believed the state's version of events over the defendant's version and rejected the defendant's claim of self-defense. *Patterson* at ¶ 45; *Blacker* at ¶ 103.

{¶ 78} To defeat defendant's claim of self-defense, the state was required to prove, beyond a reasonable doubt, any of the following: (1) defendant was at fault in creating the situation that gave rise to the affray, (2) defendant did not have a bona fide belief he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape, or (3) defendant violated a duty to retreat or avoid the danger.[3] *Messenger* at ¶ 14; *State v. Hasbrouck*, 2025-Ohio-5816, ¶ 53 (10th Dist.); *Ross* at ¶ 44. Defendant, primarily, argues his convictions are against the manifest weight of the evidence because the evidence shows he was not at fault in creating the situation that gave rise to the affray.

{¶ 79} An accused may be at fault in creating the situation that gives rise to the affray even if the accused is not the immediate aggressor. *Ross* at ¶ 46; *Patterson* at ¶ 41. " 'A person may not provoke an assault or voluntarily enter an encounter and then claim a right of self-defense.' " *Ross* at ¶ 46, quoting *State v. Cumberlander*, 2024-Ohio-2431, ¶ 44 (10th Dist.). A defendant is at fault in creating the situation giving rise to the affray when he chooses to confront the victim, chooses to knowingly go to a place where the victim will be, or refuses to move away from the victim, even when the defendant's action is otherwise completely lawful. *Id.*; *Patterson* at ¶ 41.

{¶ 80} Defendant argues his convictions are against the manifest weight of the evidence because the evidence demonstrates he did not shoot first. To support this argument, defendant points to his own testimony that he did not shoot until he heard shots, so either Quintez or Wiley must have shot first. Thus, asserts defendant, he was not at fault in causing the situation giving rise to the affray. Defendant, however, ignores all the evidence that demonstrates he voluntarily created a violent encounter in which he and Quintez attacked Wiley.

---

[3] In 2000 Am.S.B. No. 175, the General Assembly amended R.C. 2901.09 to eliminate the duty to retreat if a defendant "is in a place in which the [defendant] lawfully has a right to be." R.C. 2901.09(B). However, this amendment to R.C. 2901.09 "does not expressly apply to acts of self-defense that occurred prior to the effective date of the amendment." *State v. Miree*, 2024-Ohio-5714, ¶ 14. Because the amendment became effective on April 6, 2021, it does not apply to these offenses, which occurred on October 7, 2020.

{¶ 81} Defendant arrived at Quintez's Arborwood apartment prepared for violence. In his interview with the police, defendant said he normally kept the magazine for his 9 mm handgun in the glove box of his Honda Civic. He told detectives that he had loaded his handgun before arriving at his brother's apartment and placed his handgun in his driver's side door pocket, within easy reach.

{¶ 82} Although defendant admitted he owned the shotgun that Quintez used to shoot at Wiley, he denied bringing it that night. Defendant testified that Quintez brought the shotgun with him. However, the jury could have reasonably disbelieved this testimony because on the surveillance video, Quintez was not carrying a shotgun when he left his apartment to help his family to his vehicle and join defendant in the Honda Civic.

{¶ 83} Alternatively, the jury could have reasonably concluded that Quintez obtained the shotgun from his vehicle. In that case, Quintez would have been carrying the shotgun when he entered defendant's vehicle the night of the shooting. Due to the large size of the shotgun, a jury could reasonably reject defendant's testimony that he did not notice that Quintez possessed the shotgun when he got into defendant's passenger seat.

{¶ 84} If defendant brought the shotgun with him, then he assisted Quintez in preparing to confront the individuals in the Chrysler 300. On the other hand, if defendant observed the shotgun in Quintez's hands, then the presence of that shotgun would have informed defendant that Quintez was ready to violently confront the occupants of the Chrysler 300.

{¶ 85} Knowing that both he and his brother possessed firearms, defendant voluntarily drove back to the Arborwood apartment when Quintez wanted to return to investigate his suspicions about the occupants of the Chrysler 300. After returning to Arborwood Drive, defendant paused his Honda Civic for about ten seconds, a short distance away from the Chrysler 300. Defendant then drove quickly towards the Chrysler 300 and stopped parallel to it for about seven seconds. Shooting began immediately. In seven seconds, defendant shot at the Chrysler 300 15 times with his 9 mm handgun, and Quintez shot at the Chrysler 300 3 times with the shotgun.

{¶ 86} When the brothers discharged their firearms, the front passenger window of the Honda Civic was down—again, showing preparation for a confrontation with the

occupants of the Chrysler 300. Although defendant denied knowing the passenger window was lowered, a jury could reasonably disbelieve that testimony.

{¶ 87} Finally, in Latham's 9-1-1 call, she stated, "I was just sitting in the car with my friend, and they started shooting at us." (Pl.'s Ex. A11 at 0:10.) Latham, therefore, identified defendant and Quintez as the aggressors in the shooting.

{¶ 88} Considering the totality of the evidence, we conclude the manifest weight of the evidence establishes that defendant was at fault in creating the situation that gave rise to the affray. Based on the record evidence, this is not a case in which the jury lost its way and created such a manifest miscarriage of justice that we must reverse defendant's convictions. To the contrary, we find that a jury could reasonably reject defendant's self-defense claim and find him guilty of murder, attempted murder, and felonious assault.

{¶ 89} Next, defendant argues his conviction for tampering with evidence is not supported by sufficient evidence and is against the manifest weight of the evidence. We disagree.

{¶ 90} " 'Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the jury verdict.' " *State v. McFarland*, 2020-Ohio-3343, ¶ 23, quoting *State v. Smith*, 1997-Ohio-355, ¶ 97. In reviewing a challenge to the sufficiency of the evidence, an appellate court must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two the syllabus, *superseded by state constitutional amendment on other grounds as stated in Smith*, 1997-Ohio-355, at ¶ 49, fn. 4. "[A]n appellate court does not ask whether the evidence should be believed but, rather, whether the evidence, 'if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.' " *State v. Pountney*, 2018-Ohio-22, ¶ 19, quoting *Jenks* at paragraph two of the syllabus.

{¶ 91} R.C. 2921.12(A)(1), which prohibits tampering with evidence, states:

> (A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:

(1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]

Therefore, to establish a defendant has tampered with evidence, the state must prove "(1) the knowledge of an official proceeding or investigation in progress or likely to be instituted, (2) the alteration, destruction, concealment, or removal of the potential evidence, [and] (3) the purpose of impairing the potential evidence's availability or value in such proceeding or investigation." *State v. Straley*, 2014-Ohio-2139, ¶ 11.

{¶ 92} In determining whether a person knew an official investigation was likely to be instituted, "[l]ikelihood is measured at the time of the act of alleged tampering." *Id.* at ¶ 19. "A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). The state may prove a defendant's knowledge through either direct or circumstantial evidence. *Jordan*, 2023-Ohio-3800, at ¶ 26. Circumstantial evidence is proof of facts, based on direct evidence, that a trier of fact infers or derives by reasoning in accordance with the common experience of mankind. *State v. Roberts*, 2025-Ohio-5120, ¶ 140; *State v. Brown*, 2016-Ohio-7944, ¶ 30 (10th Dist.). Thus, from direct evidence of the totality of the circumstances surrounding an alleged crime, a trier of fact may infer whether a defendant acted with knowledge. *State v. Fox*, 2018-Ohio-501, ¶ 14 (10th Dist.); *State v. Shumaker*, 2015-Ohio-250, ¶ 26 (10th Dist.).

{¶ 93} A trier of fact may infer a defendant knows an official investigation is likely when a defendant commits a crime that is likely to be reported. *State v. Martin*, 2017-Ohio-7556, ¶ 118; *State v. Campbell*, 2024-Ohio-2245, ¶ 29 (9th Dist.). Such crimes include shootings. *See, e.g., State v. Camacho*, 2021-Ohio-3975, ¶ 25-26 (11th Dist.); *In re S.D.*, 2019-Ohio-1867, ¶ 19 (1st Dist.); *State v. Walker*, 2005-Ohio-6365, ¶ 93 (10th Dist.); *State v. Copley*, 2005-Ohio-896, ¶ 60 (10th Dist.).

{¶ 94} The evidence in this case, when construed in favor of the state, demonstrated defendant and Quintez engaged in a drive-by shooting in the middle of an apartment complex. Together, defendant and Quintez fired 19 shots, and Wiley fired at least 6 more. Given the reportable nature of this incident, the jury could reasonably infer defendant knew at the time of the shooting that an official investigation into the shooting was likely.

{¶ 95} Second, the state had to prove defendant altered, destroyed, concealed, or removed potential evidence. Potential evidence is concealed if it is hidden or placed out of

sight. *State v. Curlee-Jones*, 2013-Ohio-1175, ¶ 11 (8th Dist.); *State v. Cortner*, 2006-Ohio-871, ¶ 13 (11th Dist.). Here, the state presented evidence that police located defendant's 9 mm handgun and shotgun in a field "in pretty heavy brush." (Tr. Vol. II at 392.) Contrary to defendant's contention that he placed the firearms in "an open area," photographic exhibits show the firearms were found beneath thick undergrowth surrounding a tree. (Appellant's Brief at 37.) After viewing the photographic evidence, the jury could reasonably conclude that defendant concealed the firearms.

{¶ 96} Finally, the state must prove that the defendant acted with the purpose of impairing the potential evidence's availability or value in the likely investigation. "A person acts purposely when it is the person's specific intention to cause a certain result[.]" R.C. 2901.22(A). In a tampering case, a trier of fact may infer the defendant's purpose from the defendant's actions and the surrounding circumstances. *State v. Rencher*, 2019-Ohio-2138, ¶ 13 (10th Dist.); *accord State v. McGee*, 2016-Ohio-7510, ¶ 28 (1st Dist.) ("Sufficient evidence exists to support a tampering-with-evidence conviction where a defendant hides a gun used in a shooting immediately after the incident.").

{¶ 97} Before obtaining life-saving medical care for his brother, defendant stopped to conceal his 9 mm handgun and shotgun in the field near Dublin Methodist Hospital. When defendant spoke with the police detectives only hours later, he did not disclose the location of the firearms. A detective specifically asked defendant, "Is there a shotgun laying on a freeway somewhere that we d[on]'t know about?" (Pl.'s Ex. U at 40:29.) Defendant answered, "No, there's no shotgun." *Id* at 40:37. Given these facts, a reasonable trier of fact could conclude that when defendant secreted the firearms in the field, he did so to keep the police from collecting the firearms as evidence in their investigation of the shooting.

{¶ 98} After considering all three elements of the tampering charge, we conclude the state presented sufficient evidence for defendant's conviction. We thus turn to addressing whether defendant's conviction for tampering with the evidence is against the manifest weight of the evidence.

{¶ 99} As defendant points out, he testified that he did not think that an investigation into the shooting was likely when he left his 9 mm handgun and shotgun in the field near Dublin Methodist Hospital. He claimed he discarded the firearms in the field

because he did not want to appear threatening to the security guards stationed at the hospital.

{¶ 100} A reasonable trier of fact, however, could disbelieve defendant's testimony. Defendant knew that he had just participated in a drive-by shooting in a residential neighborhood, and Wiley's shots had riddled his vehicle with bullets and critically injured Quintez with a gunshot wound. Defendant planned to deliver his brother, in his damaged vehicle, to the hospital. Given these circumstances, the jury could reasonably infer defendant knew the police would become involved and begin an investigation. Moreover, the jury could reasonably reject defendant's professed purpose for leaving the firearms in the field. We, therefore, conclude defendant's tampering conviction is not against the manifest weight of the evidence.

{¶ 101} In sum, we conclude defendant's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence. Accordingly, we overrule defendant's fourth assignment of error.

### E. Fifth Assignment of Error – Sentencing Error

{¶ 102} By defendant's fifth assignment of error, he argues the trial court erred in sentencing him to multiple consecutive prison terms for firearm specifications. More specifically, defendant argues his sentence is contrary to law because R.C. 2929.14 prohibited the trial court from ordering him to serve the prison terms for the specifications attached to Counts 1 and 3 consecutively. We disagree.

{¶ 103} R.C. 2953.08(G)(2) generally governs an appellate court's review of felony sentences. *State v. Brefford*, 2025-Ohio-4436, ¶ 114 (10th Dist.). Under that statute, an appellate court may modify or vacate a sentence only if it clearly and convincingly finds either (1) the record does not support the sentencing court's findings under certain statutes, none of which are applicable in this case, or (2) the sentence is otherwise contrary to law. R.C. 2953.08(G)(2).

{¶ 104} As we stated above, the trial court sentenced defendant on three counts. Each count included a separate prison sentence for a firearm specification. For Count 1 (murder), the trial court sentenced defendant to an additional 60 months in prison for the firearm specification set forth in R.C. 2941.146(A), known as the "drive-by shooting specification." For Count 3 (attempted murder), the trial court sentenced defendant to an

additional three years in prison for the firearm specification set forth in R.C. 2941.145(A), to be served consecutively with Count 3. For Count 5 (tampering with evidence), the trial court sentenced defendant to an additional one year in prison for the firearm specification set forth in R.C. 2941.141(A), to be served concurrently with Count 5.

{¶ 105} The trial court sentenced defendant to the additional five-year prison term pursuant to R.C. 2929.14(B)(1)(c)(i), which requires the imposition of such a term if an offender is convicted of "a felony that includes, as an essential element, purposely or knowingly causing or attempting to cause the death of or physical harm to another" and is also convicted of the R.C. 2941.146 specification "that charges the offender with committing the offense by discharging a firearm from a motor vehicle other than a manufactured home." A prison term imposed for the R.C. 2941.146 "drive-by shooting" specification is a mandatory prison term. R.C. 2941.146(A); *State v. Peoples*, 2019-Ohio-2141, ¶ 11 (10th Dist.).

{¶ 106} The trial court sentenced defendant for the additional three-year prison term pursuant to R.C. 2929.14(B)(1)(a)(ii), which requires a trial court to impose such a term if an offender is convicted of a felony and also is convicted of the R.C. 2941.145 specification "that charges the offender with having a firearm on or about the offender's person or under the offender's control while committing the offense and displaying the firearm, brandishing the firearm, indicating that the offender possessed the firearm, or using it to facilitate the offense[.]" A prison term imposed for the R.C. 2941.145 specification is a mandatory prison term. R.C. 2941.145(A); *White*, 2015-Ohio-492, at ¶ 30.

{¶ 107} According to R.C. 2929.14(C)(1)(a):

> Subject to division (C)(1)(b) of this section, if a mandatory prison term is imposed upon an offender pursuant to division (B)(1)(a) of this section for having a firearm on or about the offender's person or under the offender's control while committing a felony, if a mandatory prison term is imposed upon an offender pursuant to division (B)(1)(c) of this section for committing a felony specified in that division by discharging a firearm from a motor vehicle, or if both types of mandatory prison terms are imposed, the offender shall serve any mandatory prison term imposed under either division consecutively to any other mandatory prison term imposed under either division or under division (B)(1)(d) of this section, consecutively to and prior to any prison term imposed for the underlying felony pursuant to division (A), (B)(2), or (B)(3) of

> this section or any other section of the Revised Code, and consecutively to any other prison term or mandatory prison term previously or subsequently imposed upon the offender.

Under the plain language of this division, if a trial court imposes a mandatory prison term under R.C. 2929.14(B)(1)(a), it must be served consecutively to a mandatory prison term imposed under R.C. 2929.14(B)(1)(c), as well as consecutively to any prison term imposed for the underlying felonies and any other prison term imposed. *State v. Beatty*, 2024-Ohio-5684, ¶ 12.

{¶ 108} Applying R.C. 2929.14(C)(1)(a) to defendant's sentence, defendant must serve the mandatory three-year prison term imposed under R.C. 2929.14(B)(1)(a)(ii) consecutively to the mandatory five-year prison term imposed under R.C. 2929.14(B)(1)(c)(i). We thus find defendant's sentence is not clearly and convincingly contrary to law. Accordingly, we overrule defendant's fifth assignment of error.

## IV. Disposition

{¶ 109} For the foregoing reasons, we overrule defendant's five assignments of error, and we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BOGGS, P.J., and JAMISON, J., concur.

———————————